## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF MISSISSIPPI
## SOUTHERN DIVISION

|  |  |
|---|---|
| ERICA WILLIAMS, RAYMOND NOX, SABRA PETERSON, and TARA DINKINS, individually and on behalf of all others similarly situated, <br><br> Plaintiffs, <br><br> v. <br><br> SINGING RIVER HEALTH SYSTEM d/b/a/ SINGING RIVER GULFPORT and SINGING RIVER GULFPORT, <br><br> Defendant. | CASE NO.: 1:24-cv-00024-LG-RPM <br><br> **CONSOLIDATED AMENDED CLASS ACTION COMPLAINT** <br><br> JURY TRIAL DEMANDED |

## <u>CONSOLIDATED AMENDED CLASS ACTION COMPLAINT</u>

1.     Plaintiffs Erica Williams,[1] Raymond Nox, Sabra Peterson, and Tara Dinkins ("Plaintiffs"), individually and on behalf of all others similarly situated ("Class"), bring this action against Defendant Singing River Health System d/b/a/ Singing River Gulfport and Singing River Gulfport (collectively, "Singing River" or "Defendant") to obtain damages, restitution, and injunctive relief from Defendant. Plaintiffs make the following allegations upon information and belief, except as to their own actions, the investigation of their counsel, and facts that are a matter of public record.

---

[1] Plaintiff Lila Austin, who originally filed a related case in this Court, Case No. 1:24-cv-00151-HSO, has or will be filing a Rule 41 Notice of Voluntarily Dismissal. Counsel who filed that matter and were admitted *pro hac vice* into that matter, joins in this Consolidated Amended Complaint.

**NATURE OF THE ACTION**

2.      With this action, Plaintiffs seek to hold Defendant responsible for the harms it caused Plaintiffs and similarly situated persons in the preventable data breach of Defendant's inadequately protected computer network.

3.      This class action arises out of Defendant's failures to properly secure, safeguard, encrypt, and/or timely and adequately destroy Plaintiffs' and Class Members' sensitive personal identifiable information that it had acquired and stored for its business purposes.

4.      Singing River's failure to secure and monitor its network resulted in what it refers to as a "malicious and sophisticated ransomware attack" in August 2023 (the "Data Breach"). Through this targeted breach, the highly sensitive documents and information Singing River, an organization that provides medical treatment and/or employment to individuals, stored on its computer network was publicly released and, upon information and belief, sold or marketed for sale on the dark web.

5.      Defendant's data security failures allowed the August 2023 compromise of its Defendant's network, and *which its own investigation determined* exposed the personally identifiable information ("PII") and protected health information ("PHI") (collectively, "the Private Information") of Plaintiffs and other individuals ("the Class").

6.      Although Defendant's notice letters include carefully crafted qualifying language (like its "investigation determined that the information potentially impacted *may* include . . . " (emphasis in original)), and disclaimers about information that no investigation by Defendant would be able to determine (like "We have no evidence that any of your information was used for identity theft or fraud."), Defendant nevertheless does not deny that: 1) criminals were able to freely hack into its computers, 2) the attack was intentional, 3) notice was sent only to individuals

whose information was or "may have been" in impacted files, and 4) affected people should "remain vigilant" watching for identity theft and fraud for at least the following "12 to 24 months." S*ee* Collective Exhibit A, Notice Letters.

7.      According to its notice letters, Defendant discovered the "data security incident" on its network on August 19, 2023. *See* Ex. A.

8.      Defendant's website notice originally stated: "Singing River took immediate steps to contain the threat and enable hospital operations, including services to its patients, to continue uninterrupted. Singing River simultaneously launched a full investigation designed to understand the nature and scope of what occurred, what information was stored on impacted systems at the time of the incident, and to whom that information relates. The investigation remains ongoing at this time."[2]

9.      By May 16, 2024, Singing River's website notice admitted that its "investigation determined that the type of information potentially impacted includes name, date of birth, address, Social Security number, medical information, and health information."[3]

10.     Despite learning of the Data Breach on or about August 19, 2023, and determining that Private Information was involved in the breach by September 13, 2023, ***Defendant did not begin sending notices of the Data Breach until January 12, 2024.*** *See* Collective Ex. A. Time is of the essence to reduce or prevent identity fraud when the theft and exposure of PII occurs, thus, Defendant's extremely delayed notice caused Plaintiffs and the Class greater injuries than if notice had been timely.

---

[2] http://www.singingriverhealthcare.org/ (*see* Notice of Data Event) (accessed Jan. 22, 2024, and since edited or removed).

[3] https://singingriverhealthsystem.com/2023/10/notice-of-data-event/ (last accessed July 24, 2024).

11.     As originally reported on or about January 12, 2024, the Private Information compromised in the Data Breach included certain personal or protected health information of approximately 252,890 individuals.[4] However, on May 13, 2024, Singing River admitted that its investigation has shown that the Private Information of approximately ***895,204*** individuals was breached, including that of current and former employees, patients, and Plaintiffs.

12.     The Private Information compromised in what Singing River refers to as a "ransomware attack" in which it "observed unusual activity related to the inaccessibility of certain systems within its network."[5] In other words, the cybercriminals intentionally targeted Singing River for the highly sensitive Private Information it stores on its computer network, attacked the insufficiently secured network, then exfiltrated highly sensitive PII and PHI, including but not limited to Social Security numbers. As a result, the Private Information of Plaintiffs and the Class remains in the hands of those cybercriminals.

13.     The Data Breach was a direct result of Defendant's failure to implement adequate and reasonable cybersecurity procedures and protocols necessary to protect individuals' Private Information with which it was entrusted for either medical treatment or employment or both.

14.     Plaintiffs bring this class action lawsuit on behalf of themselves and all others similarly situated to address Defendant's inadequate safeguarding of Class Members' Private Information that it collected and maintained, and for failing to provide timely and adequate notice to Plaintiffs and other Class Members that their information had been subject to the unauthorized

---

[4] https://www.maine.gov/agviewer/content/ag/985235c7-cb95-4be2-8792-a1252b4f8318/35c2ab bc-4deb-440a-abd5-6e383f80b3ab.shtml (last accessed July 29, 2024). *See* attached in Collective Exhibit A.
[5] *See* Footnote 2; *see also* Notice Letters, attached in Collective Exhibit A.

access of an unknown third party and including in that notice precisely what specific types of information were accessed and taken by cybercriminals.

15.     Defendant maintained the Private Information in a reckless manner. In particular, Plaintiffs' and Class Members' Private Information was maintained on Defendant Singing River's computer network in a condition vulnerable to cyberattacks. Upon information and belief, the mechanism of the Data Breach and potential for improper disclosure of Plaintiffs' and Class Members' Private Information was a known risk to Defendant, and thus Defendant was on notice that failing to take steps necessary to secure the Private Information from those risks left that property in a dangerous condition.

16.     Defendant disregarded the rights of Plaintiffs and Class Members by, *inter alia*, intentionally, willfully, recklessly, or negligently failing to take adequate and reasonable measures to ensure its data systems were protected against unauthorized intrusions; failing to disclose that it did not have adequately robust computer systems and security practices to safeguard Plaintiffs' and Class Members' Private Information; failing to take standard and reasonably available steps to prevent the Data Breach; and failing to provide Plaintiffs and Class Members with prompt and full notice of the Data Breach.

17.     In addition, Defendant Singing River failed to properly monitor the computer network and systems that housed the Private Information. Had Singing River properly monitored its property, it would have discovered the intrusion sooner rather than allowing cybercriminals unimpeded access to the PII and PHI of Plaintiffs Class Members.

18.     Plaintiffs' and Class Members' identities are now at risk because of Defendant's negligent conduct since the Private Information that Defendant Singing River collected and maintained is now in the hands of data thieves.

19.     Armed with the Private Information accessed in the Data Breach, data thieves can commit a variety of crimes including, *e.g.*, opening new financial accounts in Class Members' names, taking out loans in Class Members' names, using Class Members' information to obtain government benefits, filing fraudulent tax returns using Class Members' information, filing false medical claims using Class Members' information, obtaining driver's licenses in Class Members' names but with another person's photograph, and giving false information to police during an arrest.

20.     As a result of the Data Breach, Plaintiffs and Class Members have been exposed to a current, imminent, and ongoing risk of fraud and identity theft. Plaintiffs and Class Members must now and for years into the future closely monitor their financial accounts to guard against identity theft.

21.     Plaintiffs and Class Members have already or may in the future incur out of pocket costs for, *e.g.*, purchasing credit monitoring services, credit freezes, credit reports, or other protective measures to deter and detect identity theft.

22.     The risk of identity theft is not speculative or hypothetical but is impending and has materialized as there is evidence that the Plaintiffs' and Class Members' Private Information was targeted, accessed, has been misused, and disseminated on the Dark Web.

23.     Through this Complaint, Plaintiffs seek to remedy these harms on behalf of themselves and all similarly situated individuals whose Private Information was accessed during the Data Breach (the "Class").

24.     Accordingly, Plaintiffs bring this action against Defendant seeking redress for its unlawful conduct, and asserting claims for: (i) negligence and negligence *per se*, (ii) breach of

implied contract, (iii) invasion of privacy, (iv) breach of fiduciary duty; and (v) unjust enrichment, and (vi) declaratory relief.

26.     Plaintiffs seek remedies including, but not limited to, compensatory damages, reimbursement of out-of-pocket costs, and injunctive relief including improvements to Defendant's data security systems, future annual audits, as well as long-term and adequate credit monitoring services funded by Defendant, and declaratory relief.

26.     The exposure of an individual's Private Information to cybercriminals is a bell that cannot be un-rung. Before this Data Breach, Plaintiffs' and the Class's Private Information was exactly that—private. Not anymore. Now, their Private Information is forever exposed and unsecure.

## **PARTIES**

27.     Plaintiff Erica Williams is and at all times mentioned herein was an individual citizen of the State of Mississippi, residing in the city of Pascagoula (Jackson County). Plaintiff Williams was or is both an employee and patient of Singing River. Plaintiff Williams received notice of the Data Breach dated January 12, 2024, attached in Collective Exhibit A.

28.     Plaintiff Raymond Nox is and at all times mentioned herein was an individual citizen of the State of Mississippi, residing in the city of Biloxi (Harrison County), and was or is a patient of Singing River. Plaintiff Nox received notice of the Data Breach dated May 13, 2024, attached in Collective Exhibit A.

29.     Plaintiff Sabra Peterson is and at all times mentioned herein was an individual citizen of the State of Mississippi, residing in the city of Gulfport (Harrison County), and is a patient of Singing River. Plaintiff Peterson received notice of the Data Breach dated May 13, 2024, 2024, attached in Collective Exhibit A.

30.     Plaintiff Tara Dinkins is and at all times mentioned herein was an individual citizen of the State of Alabama, residing in the city of Grand Bay (Mobile County). Plaintiff Dinkins received notice of the Data Breach on behalf of her minor son, which was dated May 13, 2024, attached in Collective Exhibit A.

31.     According to its Articles of Incorporation filed with the Mississippi Secretary of State on March 3, 2024, Singing River Health System is a Mississippi non-profit corporation. *See* Collective Exhibit C.  On its Notice Letters, it states that it is providing notice "for itself and on behalf of its wholly owned subsidiary Singing River Gulfport." *See* Ex. A.

32.     Singing River Gulfport is a Mississippi non-profit corporation according to its Articles of Incorporation filed with the Mississippi Secretary of State on June 16, 2020. *See* Collective Ex. C.

## JURISDICTION AND VENUE

33.     This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1332(d) because this is a class action in which the amount in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, there are more than 100 members in the proposed class, and at least one member of the class is a citizen of a state different from Defendant.[6]

34.     The Court has general personal jurisdiction over Defendant because, personally or through its agents, Defendant operates, conducts, engages in, or carries on a business or business

---

[6] Defendant admits in its two notices to the Maine Attorney General that at least 63 Maine residents were affected by its Data Breach. *See* https://www.maine.gov/agviewer/content/ag/985235c7-cb95-4be2-8792-a1252b4f8318/35c2abbc-4deb-440a-abd5-6e383f80b3ab.shtml and https://www.maine.gov/agviewer/content/ag/985235c7-cb95-4be2-8792-a1252b4f8318/cbc854c8-d142-4f56-b114-91952ab24d34.shtml. In addition, at least 3512 Texas residents were affected by its Data Breach.   *See*   https://oag.my.site.com/datasecuritybreachreport/apex/DataSecurityReportsPage. (last accessed Aug. 8, 2024).

venture in this State; it is registered with the Secretary of State as a corporation; it maintains its headquarters in Mississippi; and committed tortious acts in Mississippi.

35.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 because it is the district within which Singing River is headquartered and has the most significant contacts.

## FACTUAL ALLEGATIONS

### *Defendant's Business*

36.     Defendant Singing River claims to be a "mission-driven provider of health services and one of the largest employers on the Mississippi Gulf Coast."[7]

37.     In its Articles of Incorporation as filed with the Mississippi Secretary of State on June 16, 2020, Singing River Gulfport—the entity that suffered the Data Breach—is a Mississippi non-profit corporation. *See* Collective Ex. C. Singing River Gulfport's Articles of Incorporation, Paragraph 5, explains that "Upon the dissolution of the Corporation, all of the assets of the [Singing River Gulfport] Corporation shall, after paying or making provisions for the payment of all of the liabilities of the corporation, be distributed to Singing River Health System, a Mississippi community hospital formed and existing pursuant to Miss. Code Ann. Section 41-13-10 *et seq*. . . ." *Id.* Thus, upon information and belief and based upon the plain language of Defendant's Articles of Incorporation, Singing River Gulfport, itself, is neither a "Mississippi community hospital" nor a "political subdivision of Jackson County, Mississippi" as Plaintiff Williams alleged in her original Complaint. *See* ECF No. 1 ¶ 22. Instead, it is a separate, privately organized and privately operated Section 501(c)(3) corporation.

---

[7] http://www.singingriverhealthcare.org (last accessed July 29, 2024).

38.     Similarly, on March 28, 2024, Singing River Health System filed its Articles of Incorporation with the Mississippi Secretary of State, again stating its business type is a non-profit corporation, rather than a "community hospital" or a "political subdivision." *See* Collective Ex. C.

39.     Singing River's services include primary care, behavioral care, cardiac care, ENT care, neurology, orthopedics, radiology, primary care, surgical services, urgent care, and more.[8]

40.     Singing River includes "more than 3,500 employees, physicians, staff, and volunteers"[9] It has one of the "largest emergency departments in the state, caring for more than 100,000 patients per year."[10] Moreover, its revenue exceeds $270 million per year.[11]

41.     Singing River "is comprised of three hospitals – Pascagoula Hospital, Ocean Springs Hospital, and Gulfport Hospital[, p]lus primary care medical clinics, community medical parks, and specialty centers throughout the area."[12]

42.     For the purposes of this Amended Class Action Complaint, all of Singing River's associated locations will be referred to collectively as "Singing River."

43.     In the ordinary course of receiving medical care services from Defendant Singing River, or alternatively being employed by Singing River, each patient and employee must provide (and Plaintiffs did provide) Defendant Singing River with sensitive, personal, and private information, such as their:

- Name, address, phone number, and email address;

- Date of birth;

- Social Security number;

---

[8] *Id.* (*see* Areas of Care).
[9] *Id.* (*see* About).
[10] *Id.*
[11] *Id.*
[12] *Id.*

- Marital status;

- Employer with contact information;

- Primary and secondary insurance policy holders' name, address, date of birth, and Social Security number;

- Demographic information;

- Driver's license or state or federal identification;

- Information relating to the individual's medical and medical history;

- Insurance information and coverage; and

- Banking and/or credit card information.

44.     Defendant also creates and stores medical records and other protected health information, including records of treatments and diagnoses for its patients.

45.     Upon information and belief, Singing River's HIPAA Joint Notice of Privacy Practices ("Privacy Policy") is provided to every patient both prior to receiving treatment and upon request.[13] Singing River's Privacy Notice makes clear that it understands that its patients' Private Information is personal and must be protected by law.

46.     In its Joint Notice of Privacy Practices, Singing River states, in relevant part:

Singing River Health System exists to improve the quality of life in our community by delivering quality healthcare and wellness services, including protecting your medical information. Singing River Health System is required by law to maintain the privacy of your medical information and to provide you with this Notice of our privacy practices with respect to your medical information.

*See* Joint Notice of Privacy Practices, available at: http://www.singingriverhealthcare.org/

47.     Furthermore, in its Joint Notice of Privacy Practices, Singing River acknowledges its legal duties to its patients, including that is it required to:

---

[13] *Id.* (*see* Joint Notice of Privacy Practices) (last accessed July 29, 2024).

- Maintain the privacy of protected health information

- Provide you with a notice of our legal duties and privacy practices with respect to your health information

- Abide by the terms of this notice

- Notify you if we are unable to agree with a requested restriction on how your health information is used or disclosed

- Accommodate reasonable requests you may make to communicate health information by alternatives means or at an alternative location

- Obtain your written authorization to use or disclose your health information for reasons other than those listed above and permitted under law.[14]

48.     Defendant Singing River agreed to and undertook legal duties to maintain the protected health and personal information entrusted to it by Plaintiffs and Class Members safely, confidentially, and in compliance with all applicable laws, including the Federal Trade Commission Act ("FTCA"), 15 U.S.C. § 45, and the Health Insurance Portability and Accountability Act ("HIPAA").

49.     Yet, through its failure to properly secure the Private Information of Plaintiffs and Class, Singing River failed to meet its own promises of patient privacy.

50.     The patient information held by Defendant Singing River in its computer system and network included the highly sensitive Private Information of Plaintiffs and Class Members.

### The Data Breach

51.     A data breach occurs when cybercriminals intend to access and steal Private Information that has not been adequately secured by a business entity like Singing River.

---

[14] *Id.*

52.     According to Defendant's website Notice, it discovered a malicious and sophisticated ransomware on its computer systems on or around August 19, 2023, when it took many of the healthcare provider's networked systems offline, adversely affecting patient treatment, scheduling, and the ability to access patient histories.[15]

53.     Defendant waited to notify HHS of the Data Breach until on or about October 18, 2023, and then only listing "501 affected individuals" apparently as a placeholder.[16] However, in its first Notice to Maine's Attorney General (dated January 12, 2024), it admitted that the PII and PHI of at least 252,890 individuals was affected. Yet in May 2024, Singing River admitted that its investigation actually shows that the Private Information of approximately ***895,204 individuals*** was breached.[17]

54.     Singing River disregarded the rights of Plaintiffs and Class Members by, inter alia, intentionally, willfully, recklessly, or negligently failing to take adequate and reasonable measures to ensure its data systems were protected against unauthorized intrusions; failing to disclose that it did not have adequately robust computer systems and security practices to safeguard Plaintiffs' and Class Members' Private Information; failing to take standard and reasonably available steps to prevent the Data Breach; and failing to provide Plaintiffs and Class Members with prompt and full notice of the Data Breach.

55.     Among other failures, Singing River failed to encrypt the Private Information, including Social Security numbers and sensitive PHI, of hundreds of thousands of patients and

---

[15] http://www.singingriverhealthcare.org/ (*see* Notice of Data Event) (accessed Jan. 22, 2024, since removed from its website). Similar revised notice available at: https://singingriver healthsystem.com/2023/10/notice-of-data-event/ (last accessed July 30, 2024).

[16] This information has never been updated for HHS. *See* https://ocrportal.hhs.gov/ocr/ breach/breach_report.jsf (last accessed July 30, 2024).

[17] https://www.maine.gov/agviewer/content/ag/985235c7-cb95-4be2-8792-a1252b4f8318/cbc8 54c8-d142-4f56-b114-91952ab24d34.shtml (last accessed July 30, 2024).

employees. Had the information been properly encrypted, the data thieves would not have been able to access and acquire intelligible data such as names, SSNs, and other identifying information.

56.     Singing River's failure to secure and monitor its network resulting in the "Data Breach" and the exposure of PII and PHI stored but negligently protected by Singing River, an organization that provides medical treatment and/or employment to individuals. Upon information and belief, this highly sensitive stolen data was publicly released and, upon information and belief, sold or marketed for sale on the dark web.

57.     Defendant's data security failures allowed the August 2023 compromise of its Defendant's network, and *which its own investigation determined* exposed the PII and PHI of hundreds of thousands of individuals, including Plaintiffs and Class Members.

58.     Defendant carefully crafted its Notice Letters attempting to avoid its own responsibility. For example, it used qualifying language, like its claiming its "investigation determined that the information potentially impacted *may* include" (emphasis in original) Plaintiffs' and Class Members' Social Security numbers. *See* Collective Ex. A.

59.     Furthermore, Singing River's Notice Letters also include nonsensical disclaimers about information that Defendant would *never* be able to determine, like: "We have no evidence that any of your information was used for identity theft or fraud." Clearly Defendant *cannot* know whether the Private Information of Plaintiffs and Class Members has been used for identity theft of fraud. This gratuitous statement provides only false assurances to the almost 900,000 individuals who received its notice letters.

60.     Defendant nevertheless does not deny that 1) criminals were able to freely hack into its computers, 2) the attack was intentional, 3) notice was sent only to individuals whose information was or "may have been" in impacted files, and 4) it specifically instructs affected

people (including Plaintiffs) that they should "remain vigilant" watching for identity theft and fraud for at least the following "12 to 24 months." *See* Collective Ex. A.

61.     According to Cyber News, the "Rhysida" ransomware gang claimed responsibility for the ransomware attack on three Singing River hospitals and a dozen medical clinics, as well as its laboratory and radiology testing facilities, all of which were forced to work using paper-order tests and radiology exams following the attack. [18]

62.     As the result of Defendant's negligent failure to secure its computer network, Plaintiffs and the Class were further injured by having their appointments, medical records, and access to care impeded while Defendant attempted to reconstruct its own network.

63.     The US Cybersecurity Infrastructure and Security Agency (CISA) has explained that Rhysida is known for going after "***targets of opportunity***" including insufficiently secured healthcare networks like that of Singing River. According to the Cyber News article, this ransomware gang "often sets up live auctions on its dark leak site, offering up its victim's data to the highest bidder."[19]

64.     On or about January 12, 2024, months after Singing River learned that Plaintiffs' and the Class's Private Information was attacked by cybercriminals, upon information and belief, only about one-third of Singing River's affected Data Breach victims began receiving notices of the Data Breach informing them that its investigation determined that their Private Information

---

[18] Vilius Petkauskas, *Singing River breach exposes healthcare data of 250K+ individuals*, Cyber News (Jan. 15, 2024), https://cybernews.com/news/singing-river-breach-exposes-healthcare-data/ (last accessed July 30, 2024). *See also*
Jai Vijayan, *Recent Rhysida Attacks Show Focus on Healthcare by Ransomware Actors*, Dark Reading (Sept. 13, 2023), https://www.darkreading.com/cyberattacks-data-breaches/recent-rhysida-attacks-show-focus-on-healthcare-sector-by-ransomware-actors (last accessed July 30, 2024).
[19] *Id.*

was accessed. The remaining two-thirds did not begin receiving notices until over four months later.

65.     Singing River's notice letters list time-consuming, generic steps that victims of data security incidents can take, such as getting a copy of a credit report or notifying law enforcement about suspicious financial account activity. Other than providing one year of credit monitoring that Plaintiffs and Class Members would have to affirmatively sign up for and a call center number that victims may contact if they have questions, Singing River offered no other substantive steps to help victims like Plaintiffs and Class Members to protect themselves. On information and belief, Singing River sent a similar generic letter to all other individuals affected by the Data Breach.

66.     Singing River's data security obligations were particularly important given the substantial increase in cyberattacks in recent years and readily available information on ways to avoid this sort of hacking incident. For example, in January 2023, HHS created a presentation specifically for healthcare providers and IT departments, warning entities like Singing River of the severe threats posed by Royal, BlackCat and similar cybercriminal groups.

67.     Within the healthcare industry, the risk of a cyberattack is well-known and preventable with adequate security systems in place.

68.     Singing River knew or should have known that its electronic records would be targeted by cybercriminals.

69.     Singing River had obligations created by HIPAA, FTCA, contract, industry standards, common law, and representations made to Plaintiffs and Class Members to keep their Private Information confidential and to protect it from unauthorized access and disclosure.

70.     Plaintiffs and Class Members provided their Private Information to Defendant with the reasonable expectation and mutual understanding that Defendant would comply with its obligations to keep such information confidential and secure from unauthorized access.

### *The Data Breach Was a Foreseeable Risk of which Defendant Was on Notice.*

71.     It is well known that PII, including Social Security numbers in particular, is a valuable commodity and a frequent, intentional target of cybercriminals. Companies that collect such information, including Singing River, are well-aware of the risk of being targeted by cybercriminals.

72.     Individuals place a high value not only on their PII, but also on the privacy of that data. Identity theft causes severe negative consequences to its victims, as well as severe distress and hours of lost time trying to fight against the impact of identity theft.

73.     A data breach increases the risk of becoming a victim of identity theft. Victims of identity theft can suffer from both direct and indirect financial losses. According to a research study published by the Department of Justice, "[a] direct financial loss is the monetary amount the offender obtained from misusing the victim's account or personal information, including the estimated value of goods, services, or cash obtained. It includes both out-of-pocket loss and any losses that were reimbursed to the victim. An indirect loss includes any other monetary cost caused by the identity theft, such as legal fees, bounced checks, and other miscellaneous expenses that are not reimbursed (e.g., postage, phone calls, or notary fees). All indirect losses are included in the calculation of out-of-pocket loss." [20]

---

[20] "Victims of Identity Theft, 2018," U.S. Dep't of Justice (Apr. 2021, NCJ 256085) available at: https://bjs.ojp.gov/content/pub/pdf/vit18.pdf (last accessed July 29, 2024).

74.     Individuals, like Plaintiffs and Class Members, are particularly concerned with protecting the privacy of their Social Security numbers, which are the key to stealing any person's identity and is likened to accessing your DNA for hacker's purposes.

75.     Data Breach victims suffer long-term consequences when their Social Security numbers are taken and used by hackers. Even if they know their Social Security numbers are being misused, Plaintiffs and Class Members cannot obtain new numbers unless they become a victim of Social Security number misuse.

76.     The Social Security Administration has warned that "a new number probably won't solve all your problems. This is because other governmental agencies (such as the IRS and state motor vehicle agencies) and private businesses (such as banks and credit reporting companies) will have records under your old number. Along with other personal information, credit reporting companies use the number to identify your credit record. So, using a new number won't guarantee you a fresh start. This is especially true if your other personal information, such as your name and address, remains the same."[21]

77.     In 2021, there were a record 1,862 data breaches, surpassing both 2020's total of 1,108 and the previous record of 1,506 set in 2017.[22]

78.     Additionally in 2021, there was a 15.1% increase in cyberattacks and data breaches since 2020. Over the next two years, in a poll done on security executives, they have predicted an increase in attacks from "social engineering and ransomware" as nation-states and cybercriminals

---

[21] *Identity Theft and Your Social Security Number*, Soc. Sec. Admin. (July 2021), https://www.ssa.gov/pubs/EN-05-10064.pdf (last accessed July 29, 2024).
[22] Bree Fowler, *Data breaches break record in 2021*, CNET (Jan. 24, 2022), https://www.cnet.com/tech/services-and-software/record-number-of-data-breaches-reported-in-2021-new-report-says/ (last accessed July 29, 2024).

grow more sophisticated. Unfortunately, these preventable causes will largely come from "misconfigurations, human error, poor maintenance, and unknown assets."[23]

79.     Cyberattacks have become so notorious that the FBI and U.S. Secret Service have issued a warning to potential targets so they are aware of, and prepared for, and hopefully can ward off a cyberattack.

80.     According to an FBI publication, "[r]ansomware is a type of malicious software, or malware, that prevents you from accessing your computer files, systems, or networks and demands you pay a ransom for their return. Ransomware attacks can cause costly disruptions to operations and the loss of critical information and data."[24] This publication also explains that "[t]he FBI does not support paying a ransom in response to a ransomware attack. Paying a ransom doesn't guarantee you or your organization will get any data back. It also encourages perpetrators to target more victims and offers an incentive for others to get involved in this type of illegal activity."[25]

81.     Despite the prevalence of public announcements of data breach and data security compromises, and despite its own acknowledgments of data security compromises, and despite its own acknowledgment of its duties to keep PII private and secure, Singing River failed to take appropriate steps to protect the PII of Plaintiffs and the proposed Class from being compromised.

***Data Breaches Are Rampant in Healthcare.***

82.     Defendant's data security obligations were particularly important given the substantial increase in data breaches in the healthcare industry preceding the date of the breach.

---

[23] Chuck Brooks, *Alarming Cyber Statistics For Mid-Year 2022 That You Need To Know*, FORBES (June 3, 2022), https://www.forbes.com/sites/chuckbrooks/2022/06/03/alarming-cyber-statistics-for-mid-year-2022-that-you-need-to-know/?sh=176bb6887864 (last accessed July 29, 2024).
[24] *Ransomware,* FBI, https://www.fbi.gov/how-we-can-help-you/safety-resources/scams-and-safety/common-scams-and-crimes/ransomware (last accessed Jan. 22, 2024).
[25] *Id.*

83.     According to an article in the HIPAA Journal posted on October 14, 2022, cybercriminals hack into medical practices for their "highly prized" medical records. "[T]he number of data breaches reported by HIPAA-regulated entities continues to increase every year. 2021 saw 714 data breaches of 500 or more records reported to the [HHS's Office for Civil Rights] OCR – an 11% increase from the previous year. Almost three-quarters of those breaches were classified as hacking/IT incidents."[26]

84.     Healthcare organizations are easy targets because "even relatively small healthcare providers may store the records of hundreds of thousands of patients. The stored data is highly detailed, including demographic data, Social Security numbers, financial information, health insurance information, and medical and clinical data, and that information can be easily monetized."[27]

85.     The HIPAA Journal article goes on to explain that patient records, like those stolen from Singing River, are "often processed and packaged with other illegally obtained data to create full record sets (fullz) that contain extensive information on individuals, often in intimate detail." The record sets are then sold on dark web sites to other criminals and "allows an identity kit to be created, which can then be sold for considerable profit to identity thieves or other criminals to support an extensive range of criminal activities."[28]

86.     Data breaches such as the one experienced by Defendant Singing River have become so notorious that the Federal Bureau of Investigation ("FBI") and U.S. Secret Service have

---

[26] Steve Alder, *Why Do Criminals Target Medical Records*, HIPPA J. (Nov. 2, 2023), https://www.hipaajournal.com/why-do-criminals-target-medical-records/.
[27] *Id.*
[28] *Id.*

issued a warning to potential targets so they are aware of, can prepare for, and hopefully can ward off a potential attack.

87.     In fact, according to the cybersecurity firm Mimecast, 90% of healthcare organizations experienced cyberattacks in the past year.[29]

88.     HHS data shows more than 39 million patients' information was exposed in the first half of 2023 in nearly 300 incidents and that healthcare beaches have doubled between 2020 and 2023, according to records compiled from HHS data by Health IT Security.[30]

89.     According to Advent Health University, when an electronic health record "lands in the hands of nefarious persons the results can range from fraud to identity theft to extortion. In fact, these records provide such valuable information that hackers can sell a single stolen medical record for up to $1,000."[31]

90.     The significant increase in attacks in the healthcare industry, and attendant risk of future attacks, is widely known to the public and to anyone in that industry, including Defendant Singing River.

### *Defendant Fails to Comply with FTC Guidelines.*

91.      The Federal Trade Commission ("FTC") has promulgated numerous guides for businesses which highlight the importance of implementing reasonable data security practices.

---

[29] *See* Maria Henriquez, *Iowa City Hospital Suffers Phishing Attack*, SECURITY MAGAZINE (Nov. 23, 2020), https://www.securitymagazine.com/articles/93988-iowa-city-hospital-suffers-phishing-attack (last accessed July 29, 2024).
[30] Jill McKeon, *Biggest Healthcare Data Breaches Reported This Year, So Far*, TECHTARGET (June 26, 2023), https://healthitsecurity.com/features/biggest-healthcare-data-breaches-reported-this-year-so-far (last accessed July 29, 2024).
[31] *5 Important Elements to Establish Data Security in Healthcare*, ADVENTHEALTH UNIV. (May 21, 2020), https://www.ahu.edu/blog/data-security-in-healthcare (last accessed July 29, 2024).

According to the FTC, the need for data security should be factored into all business decision-making.

92.     In October 2016, the FTC updated its publication, *Protecting Personal Information: A Guide for Business*, which established cybersecurity guidelines for businesses.  The guidelines note that businesses should protect the personal patient information that they keep; properly dispose of personal information that is no longer needed; encrypt information stored on computer networks; understand their network's vulnerabilities; and implement policies to correct any security problems.[32] The guidelines also recommend that businesses use an intrusion detection system to expose a breach as soon as it occurs; monitor all incoming traffic for activity indicating someone is attempting to hack the system; watch for large amounts of data being transmitted from the system; and have a response plan ready in the event of a breach.[33]

93.     The FTC further recommends that companies not maintain PII longer than is needed for authorization of a transaction; limit access to sensitive data; require complex passwords to be used on networks; use industry-tested methods for security; monitor for suspicious activity on the network; and verify that third-party service providers have implemented reasonable security measures.

94.     The FTC has brought enforcement actions against businesses, like that of Singing River, for failing to adequately and reasonably protect patient data, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the Federal Trade Commission

[32] *Protecting Personal Information: A Guide for Business*, FED. TRADE COMM'N (2016) https://www.ftc.gov/system/files/documents/plain-language/pdf-0136_proteting-personal-information.pdf (last accessed July 29, 2024).
[33] *Id*.

Act ("FTCA"), 15 U.S.C. § 45. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

95.     These FTC enforcement actions include actions against healthcare providers like Defendant. *See, e.g.*, *In the Matter of LabMD, Inc., A Corp*, 2016-2 Trade Cas. (CCH) ¶ 79708, 2016 WL 4128215, at *32 (MSNET July 28, 2016) ("[T]he Commission concludes that LabMD's data security practices were unreasonable and constitute an unfair act or practice in violation of Section 5 of the FTC Act.").

96.     Defendant failed to properly implement basic data security practices.

97.     Defendant's failure to employ reasonable and appropriate measures to protect against unauthorized access to patients' PII and PHI constitutes an unfair act or practice prohibited by Section 5 of the FTC Act, 15 U.S.C. § 45.

98.     Defendant was at all times fully aware of its obligation to protect the PII and PHI of its patients and employees. Defendant was also aware of the significant repercussions that would result from its failure to do so.

### *Defendant Fails to Comply with Industry Standards.*

99.     As shown above, experts studying cybersecurity routinely identify healthcare providers as being particularly vulnerable to cyberattacks because of the value of the PII and PHI which they collect and maintain.

100.     Several best practices have been identified that a minimum should be implemented by healthcare providers like Defendant, including but not limited to: educating all employees; utilizing strong passwords; creating multi-layer security, including firewalls, anti-virus, and anti-malware software; encryption, making data unreadable without a key; using multi-factor authentication; protecting backup data, and; limiting which employees can access sensitive data.

101.    Other best cybersecurity practices that are standard in the healthcare industry include installing appropriate malware detection software; monitoring and limiting the network ports; protecting web browsers and email management systems; setting up network systems such as firewalls, switches and routers; monitoring and protection of physical security systems; protection against any possible communication system; training staff regarding critical points.

102.    Defendant failed to meet the minimum standards of any of the following frameworks: the NIST Cybersecurity Framework Version 1.1 (including without limitation PR.AC-1, PR.AC-3, PR.AC-4, PR.AC-5, PR.AC-6, PR.AC-7, PR.AT-1, PR.DS-1, PR.DS-5, PR.PT-1, PR.PT-3, DE.CM-1, DE.CM-4, DE.CM-7, DE.CM-8, and RS.CO-2), and the Center for Internet Security's Critical Security Controls (CIS CSC), which are all established standards in reasonable cybersecurity readiness.

103.    These frameworks are existing and applicable industry standards in the healthcare industry, yet Defendant failed to comply with these accepted standards, thereby opening the door to and failing to thwart the Data Breach.

### *Defendant's Conduct Violates HIPAA.*

104.    HIPAA requires covered entities such as Defendant to protect against reasonably anticipated threats to the security of sensitive patient health information (PHI).

105.    Covered entities must implement safeguards to ensure the confidentiality, integrity, and availability of PHI. Safeguards must include physical, technical, and administrative components.

106.    Title II of HIPAA contains what are known as the Administrative Simplification provisions. 42 U.S.C. §§ 1301, *et seq*. These provisions require, among other things, that the Department of Health and Human Services ("HHS") create rules to streamline the standards for

handling PII like the data Defendant left unguarded. The HHS subsequently promulgated multiple regulations under authority of the Administrative Simplification provisions of HIPAA. These rules include 45 C.F.R. § 164.306(a)(1-4); 45 C.F.R. § 164.312(a)(1); 45 C.F.R. § 164.308(a)(1)(i); 45 C.F.R. § 164.308(a)(1)(ii)(D), and 45 C.F.R. § 164.530(b).

107.    A Data Breach such as the one Defendant experienced, is considered a breach under the HIPAA rules because there is an access of PHI not permitted under the HIPAA Privacy Rule:

> A breach under the HIPAA Rules is defined as, " . . . the acquisition, access, use, or disclosure of PHI in a manner not permitted under the [HIPAA Privacy Rule] which compromises the security or privacy of the PHI." *See* 45 C.F.R. § 164.40.

108.    Defendant's Data Breach resulted from a combination of insufficiencies that demonstrate it failed to comply with safeguards mandated by HIPAA regulations.

### *Defendant Has Breached its Obligations to Plaintiffs and Class.*

109.    Defendant breached its obligations to Plaintiffs and Class Members and/or was otherwise negligent and reckless because it failed to properly maintain and safeguard its computer systems and its patients' data. Defendant's unlawful conduct includes, but is not limited to, the following acts and/or omissions:

a.  Failing to maintain an adequate data security system to reduce the risk of data breaches and cyberattacks;

b.  Failing to adequately protect patients' Private Information;

c.  Failing to properly monitor its own data security systems for existing intrusions;

d.  Failing to ensure that vendors with access to Defendant's protected health data employed reasonable security procedures;

e. Failing to ensure the confidentiality and integrity of electronic PHI it created, received, maintained, and/or transmitted, in violation of 45 C.F.R. § 164.306(a)(1);

f. Failing to implement technical policies and procedures for electronic information systems that maintain electronic PHI to allow access only to those persons or software programs that have been granted access rights in violation of 45 C.F.R. § 164.312(a)(1);

g. Failing to implement policies and procedures to prevent, detect, contain, and correct security violations in violation of 45 C.F.R. § 164.308(a)(1)(i);

h. Failing to implement procedures to review records of information system activity regularly, such as audit logs, access reports, and security incident tracking reports in violation of 45 C.F.R. § 164.308(a)(1)(ii)(D);

i. Failing to protect against reasonably anticipated threats or hazards to the security or integrity of electronic PHI in violation of 45 C.F.R. § 164.306(a)(2);

j. Failing to protect against reasonably anticipated uses or disclosures of electronic PHI that are not permitted under the privacy rules regarding individually identifiable health information in violation of 45 C.F.R. § 164.306(a)(3);

k. Failing to ensure compliance with HIPAA security standard rules by Defendant's workforce in violation of 45 C.F.R. § 164.306(a)(4);

l. Failing to train all members of Defendant's workforce effectively on the policies and procedures regarding PHI as necessary and appropriate for the

members of their workforces to carry out their functions and to maintain security of PHI, in violation of 45 C.F.R. § 164.530(b); and/or

m.   Failing to render the electronic PHI it maintained unusable, unreadable, or indecipherable to unauthorized individuals, as it had not encrypted the electronic PHI as specified in the HIPAA Security Rule by "the use of an algorithmic process to transform data into a form in which there is a low probability of assigning meaning without use of a confidential process or key" (45 C.F.R. § 164.304 definition of encryption).

110.   As the result of maintaining its computer systems in manner that required security upgrading, inadequate procedures for handling emails containing ransomware or other malignant computer code, and inadequately trained employees who opened files containing the ransomware virus, Defendant negligently and unlawfully failed to safeguard Plaintiffs' and Class Members' Private Information.

111.   Accordingly, as outlined below, Plaintiffs and Class Members now face an imminent risk of fraud and identity theft.

### Data Breaches Put Consumers at an Increased Risk of Fraud and Identify Theft.

112.   Data Breaches such as the one experienced by Plaintiffs and the Class are especially problematic because of the disruption they cause to the overall daily lives of victims affected by the attack.

113.   In 2019, the United States Government Accountability Office released a report addressing the steps consumers can take after a data breach.[34] Its appendix of steps consumers

---

[34] https://www.gao.gov/assets/gao-19-230.pdf (last accessed July 29, 2024). *See* attached as Exhibit B.

should consider, in extremely simplified terms, continues for five pages. In addition to explaining specific options and how they can help, one column of the chart explains the limitations of the consumers' options. *See* GAO chart of consumer recommendations, reproduced and attached as Exhibit B. It is clear from the GAO's recommendations that the steps Data Breach victims (like Plaintiffs and the Class) must take after a breach like Defendant's are both time consuming and of only limited and short-term effectiveness.

114.     The FTC, like the GAO (*see* Exhibit B), recommends that identity theft victims take several steps to protect their personal and financial information after a data breach, including contacting one of the credit bureaus to place a fraud alert (consider an extended fraud alert that lasts for 7 years if someone steals their identity), reviewing their credit reports, contacting companies to remove fraudulent charges from their accounts, placing a credit freeze on their credit, and correcting their credit reports.[35]

115.     Identity thieves use stolen personal information such as Social Security numbers for a variety of crimes, including credit card fraud, phone or utilities fraud, and bank/finance fraud.

116.     Identity thieves can also use Social Security numbers to obtain a driver's license or official identification card in the victim's name but with the thief's picture; use the victim's name and Social Security number to obtain government benefits; or file a fraudulent tax return using the victim's information.

117.     Theft of Private Information is also gravely serious. PII/PHI is a valuable property right.[36]

---

[35] *See* https://www.identitytheft.gov/Steps (last accessed July 29, 2024).
[36] *See, e.g.,* John T. Soma, et al, Corporate Privacy Trend: The "Value" of Personally Identifiable Information ("PII") Equals the "Value" of Financial Assets, 15 Rich. J.L. & Tech. 11, at *3-4 (2009) ("PII, which companies obtain at little cost, has quantifiable value that is rapidly reaching a level comparable to the value of traditional financial assets.") (citations omitted).

118.    It must also be noted there may be a substantial time lag – measured in years -- between when harm occurs versus when it is discovered, and also between when Private Information and/or financial information is stolen and when it is used. According to the U.S. Government Accountability Office, "bad actors can use stolen information for years after a breach." [37]

119.    Private Information and financial information are such valuable commodities to identity thieves that once the information has been compromised, criminals often trade the information on the "cyber black-market" for years.

120.    There is a strong probability that the entirety of the stolen information has been dumped on the black market or will be dumped on the black market, meaning Plaintiffs and Class Members are at an increased risk of fraud and identity theft for many years into the future. Thus, Plaintiffs and Class Members must vigilantly monitor their financial and medical accounts for many years to come.

121.    As the HHS warns, "PHI can be exceptionally valuable when stolen and sold on a black market, as it often is. PHI, once acquired by an unauthorized individual, can be exploited via extortion, fraud, identity theft and data laundering. At least one study has identified the value of a PHI record at $1000 each."[38]

122.    Furthermore, the Social Security Administration has warned that identity thieves can use an individual's Social Security number to apply for additional credit lines.[39] Such fraud

[37] https://www.gao.gov/assets/gao-19-230.pdf (last accessed July 29, 2024).
[38] *A Cost Analysis of Healthcare Sector Data Breaches* at 2, HHS (Apr. 12, 2019), https://www.hhs.gov/sites/default/files/cost-analysis-of-healthcare-sector-data-breaches.pdf (citations omitted) (last accessed July 29, 2024).
[39] *Identity Theft and Your Social Security Number* at 1, Soc. Sec. Admin. (2018), https://www.ssa.gov/pubs/EN-05-10064.pdf (last accessed July 29, 2024).

may go undetected until debt collection calls commence months, or even years, later. Stolen Social Security numbers also make it possible for thieves to file fraudulent tax returns, file for unemployment benefits, or apply for a job using a false identity.[40] Each of these fraudulent activities is difficult to detect. An individual may not know that his or her Social Security Number was used to file for unemployment benefits until law enforcement notifies the individual's employer of the suspected fraud. Fraudulent tax returns are typically discovered only when an individual's authentic tax return is rejected.

123.    Moreover, it is not an easy task to change or cancel a stolen Social Security number. An individual cannot obtain a new Social Security number without significant paperwork and evidence of actual misuse. Even then, a new Social Security number may not be effective, as "[t]he credit bureaus and banks are able to link the new number very quickly to the old number, so all of that old bad information is quickly inherited into the new Social Security number."[41]

124.    This data, as one would expect, demands a much higher price on the black market. Martin Walter, senior director at cybersecurity firm RedSeal, explained, "[c]ompared to credit card information, personally identifiable information and Social Security numbers are worth more than 10x on the black market."[42]

125.    In recent years, the medical and financial services industries have experienced disproportionally higher numbers of data theft events than other industries. Defendant therefore

---

[40] *Id.* at 4.

[41] Brian Naylor, *Victims of Social Security Number Theft Find It's Hard to Bounce Back*, NPR (Feb. 9, 2015), http://www.npr.org/2015/02/09/384875839/data-stolen-by-anthem-s-hackers-has-millions-worrying-about-identity-theft (last accessed July 29, 2024).

[42] Tim Greene, *Anthem Hack: Personal Data Stolen Sells for 10x Price of Stolen Credit Card Numbers*, Computer World (Feb. 6, 2015), http://www.itworld.com/article/2880960/anthem-hack-personal-data-stolen-sells-for-10x-price-of-stolen-credit-card-numbers.html (last accessed Jan. 22, 2024).

knew or should have known this and strengthened its data systems accordingly. Defendant was put on notice of the substantial and foreseeable risk of harm from a data breach, yet it failed to properly prepare for that risk.

## PLAINTIFFS' EXPERIENCES

### *Plaintiff Erica Williams*

126.    Plaintiff Erica Williams is and at all times mentioned herein was an individual citizen residing in the State of Mississippi.

127.    Plaintiff Williams is and was an employee of Singing River at all times relevant to this Complaint. In exchange for employment, and as a mandatory precursor to her employment, she provided sensitive PII to Signing River, including but not limited to her full legal name, date of birth, and Social Security number.

128.    In addition, Plaintiff Williams is a former patient of Singing River, receiving medical treatment there in approximately 2022. At the time that she sought medical treatment at Singing River, she was required to provide highly sensitive medical information and healthcare insurance information, most of which was and is protected by HIPAA. She recalls that she did sign a HIPAA privacy notice before she was treated, and she reasonably expected that Singing River would protect the information that she provided, as well as the details of her medical treatment that it generated in the course of her treatment.

129.    Plaintiff Williams received a Notice of Data Breach Letter regarding her identification as an affected person during Singing River's investigation of its Data Breach. Her notification letter is dated January 12, 2024. *See* Collective Ex. A.

130.    The Notice Letter that Plaintiff received does not explain exactly which parts of her PII and PHI were accessed and taken but instead generically states that the affected files contained

her "name, date of birth, address, Social Security number, medical information, and health information." *See* Collective Ex. A.

131.    Plaintiff Williams is especially alarmed by the vagueness of her stolen extremely private medical information (PHI) and equally by the fact that her Social Security number was identified along with other personally identifying information as among the breached data on Singing River's computer system.

132.    Since the Data Breach, Plaintiff Williams monitors her financial accounts for about 2 hours per week. This is more time than she spent prior to learning of the Singing River's Data Breach. Having to do this every week not only wastes her time, which she could use for more productive activities. As a result of Singing River's negligence and at its direct recommendation (*see* Ex. A), her time is wasted.

133.    The direct impacts of the Data Breach on her life have also caused (and continues to cause) Plaintiff Williams great stress and anxiety. As Singing River explains in its Notice Letter to her, she must "remain vigilant against incidents of identity theft and fraud by reviewing [her] account statements and monitoring [her] credit reports for suspicious activity and to detect errors over the next 12 to 24 months." *See* Collective Ex. A.

134.    Since the Data Breach occurred, Plaintiff Williams was specifically notified through Credit Karma and Experian that her personal information was found on the Dark Web. This information is consistent with the practices of the Rhysida ransomware gang, as explained herein.

135.    After the Singing River Data Breach, Plaintiff Williams began receiving an excessive number of spam calls and texts on the same cell phone number that she provided to Singing River on her employment and patient records. Once the Notice Letter was delivered, and

given the timing of the Data Breach, she believed that the calls and texts were directly related to her stolen PII in Singing River's Data Breach. This spam was such a stressor and a distraction as well as a waste of her time each day.

136.    After the original complaint was filed in this matter, Plaintiff Williams was forced to change her personal cellphone number to try to regain her privacy. Although this action was necessary, a cellphone number change also is a time sink. It requires that she update people who legitimately need to contact her, including family members, friends, and businesses.

137.    In addition, Plaintiff Williams still receives *many* spam emails now, which was not typical before the Data Breach. She cannot figure out any other explanation than that it is related to Singing River's Data Breach which included her Private Information.

138.    Plaintiff Williams suffered actual injury from the exposure and theft of her PII/PHI—which violates her rights to privacy.

139.    Plaintiff Williams is aware that cybercriminals often sell Private Information, and one stolen, it is likely to be abused months or even years after Singing River's Data Breach. She anticipates spending considerable time and money on an ongoing basis to try to mitigate and address the present and impending injuries caused by the Data Breach.

140.    On July 30, 2024, Plaintiff Williams sent Defendant notice, via certified mail and pursuant to the Mississippi Tort Claims Act, Miss. Code §§ 11-46-11, *et seq*., of Defendant's failure to "prevent [her] nonencrypted and nonredacted PII from unauthorized access and exfiltration, theft, or disclosure" and "implement and maintain reasonable security procedures and practices." Defendant has yet to cure such inadequacies.

141.    Had Plaintiff Williams been aware that Singing River's computer systems were not secure, she would not have entrusted Singing River with her PII and PHI.

*Plaintiff Raymond Nox*

142.    Plaintiff Raymond Nox is and at all times mentioned herein was an individual citizen residing in the State of Mississippi.

143.    Plaintiff Nox was a patient of Singing River since about 2016. At the time that he sought medical treatment at Singing River, he was required to provide highly sensitive medical information and healthcare insurance information, most of which was and is protected by HIPAA.

144.    Plaintiff Nox received a Notice of Data Breach Letter regarding his identification as an affected person during Singing River's investigation of its Data Breach. His notification letter is dated May 13, 2024. *See* Collective Ex. A.

145.    Plaintiff Nox diligently protects his Private Information and would never knowingly share unencrypted Private Information over the Internet.

146.    Plaintiff Nox is not aware of ever being part of a data breach involving his medical records and is concerned that it and other Private Information has now been exposed to bad actors.

147.    As a result of the Data Breach, Plaintiff Nox made reasonable efforts to mitigate the impact of the Data Breach, including but not limited to researching the Data Breach, and reviewing credit reports and financial account statements for any indications of actual or attempted identity theft or fraud. Plaintiff Nox monitors his Private Information multiple times a week and has already spent many hours dealing with the Data Breach, valuable time Plaintiff Nox otherwise would have spent on other activities.

148.    Following the Data Breach, Plaintiff Nox suffered actual fraud in the form of unauthorized charges on his checking account, most recently in about June 2024.

149.    Plaintiff Nox suffered actual injury from having his Private Information compromised as a result of the Data Breach including, but not limited to (a) damage to and

diminution in the value of Private Information, a form of property that Defendant obtained from Plaintiff Nox; (b) violation of privacy rights; and (c) present, imminent and impending injury arising from the increased risk of identity theft and fraud. As a result of the Data Breach, Plaintiff Nox has experienced increased amounts of scam emails, texts and phones calls.

150.    As a result of the Data Breach, Plaintiff Nox is at a present risk and will continue to be at increased risk of identity theft and fraud for his lifetime.

151.    Plaintiff Nox greatly values his privacy, and would not have provided his Private Information, undertaken the services and paid the amounts he did had he known that his Private Information would be maintained using inadequate data security systems.

### *Plaintiff Sabra Peterson*

152.    Plaintiff Sabra Peterson is and at all times mentioned herein was an individual citizen residing in the State of Mississippi.

153.    Plaintiff Peterson is a patient of Singing River, receiving medical treatment there for approximately three to four years. At the time that she sought medical treatment at Singing River, she was required to provide highly sensitive medical information and healthcare insurance information, most of which was and is protected by HIPAA. She recalls that she did sign a HIPAA privacy notice before she was treated, and she reasonably expected that Singing River would protect the information that she provided, as well as the details of her medical treatment that it generated in the course of her treatment.

154.    Plaintiff Peterson received a Notice of Data Breach Letter regarding her identification as an affected person during Singing River's investigation of its Data Breach. Her notification letter is dated May 13, 2024. *See* Collective Ex. A.

155.    The Notice Letter that Plaintiff Peterson received does not explain exactly which parts of her PII and PHI were accessed and taken but instead generically states that the affected files contained her "name, date of birth, address, Social Security number, medical information, and health information." *See* Collective Ex. A.

156.    Plaintiff Peterson is especially alarmed by the vagueness of her stolen extremely private medical information (PHI) and equally by the fact that her Social Security number was identified along with other personally identifying information as among the breached data on Singing River's computer system.

157.    In June 2024, Plaintiff Peterson discovered that she had fraudulent charge on her debit card, which required her to replace the card to reduce the risk of additional identity theft. She was able to stop the transaction, however, she was required to spend time doing so, and which she could have used for more productive purposes. She also received notice from her Discover Card that her Private Information was found on the Dark Web.

158.    Since the Data Breach, Plaintiff Peterson monitors her financial accounts closely, spending more time than she spent prior to learning of the Singing River's Data Breach. Having to do this every week not only wastes her time, which she could use for more productive activities. As a result of Singing River's negligence and at its direct recommendation (*see* Ex. A), her time is wasted.

159.    The direct impacts of the Data Breach on her life have also caused (and continues to cause) Plaintiff Peterson stress and anxiety. As Singing River explains in its Notice Letter to her, she must "remain vigilant against incidents of identity theft and fraud by reviewing [her] account statements and monitoring [her] credit reports for suspicious activity and to detect errors over the next 12 to 24 months." *See* Collective Ex. A.

160.   After the Singing River Data Breach, Plaintiff Peterson began receiving an excessive number of spam calls on the same cell phone number that she provided to Singing River on patient records. Once the Notice Letter was delivered, and given the timing of the Data Breach, she believed that the calls and texts were directly related to her stolen PII in Singing River's Data Breach. This spam was such a stressor and a distraction as well as a waste of her time each day.

161.   Plaintiff Peterson suffered actual injury from having her Private Information compromised as a result of the Data Breach including, but not limited to (a) damage to and diminution in the value of Private Information, a form of property that Defendant obtained from Plaintiff; (b) violation of privacy rights; and (c) present, imminent and impending injury arising from the increased risk of identity theft and fraud.

162.   As a result of the Data Breach, Plaintiff Peterson is at a present risk and will continue to be at increased risk of identity theft and fraud for her lifetime.

163.   Plaintiff Peterson greatly values her privacy, and would not have provided her Private Information, undertaken the services and paid the amounts that she did if she had known that her Private Information would be maintained using inadequate data security systems.

164.   Plaintiff Peterson sent Defendant notice, via certified mail and pursuant to the Mississippi Tort Claims Act, Miss. Code §§ 11-46-11, *et seq*., of Defendant's failure to "prevent [her] nonencrypted and nonredacted PII from unauthorized access and exfiltration, theft, or disclosure" and "implement and maintain reasonable security procedures and practices." Defendant has yet to cure such inadequacies and has until September 9, 2024 to do so.

### *Plaintiff Tara Dinkins*

165.   Plaintiff Tara Dinkins is and at all times mentioned herein was an individual citizen residing in the State of Alabama.

166.   Plaintiff Dinkins received a Notice of Data Breach Letter regarding her minor child's Private Information being accessed during Singing River's Data Breach. Her notification letter is dated May 13, 2024. See Collective Ex. A.

167.   Plaintiff Dinkins is uncertain whether her minor child was ever a patient of Singing River, but she believes the child *may have* been treated at a clinic about ten years ago that was later acquired by Singing River. She is uncertain why or how Singing River has her child's Private Information.

168.   At the time that Plaintiff Dinkins sought medical treatment for her child at the potentially related clinic, she was required to provide highly sensitive medical information and healthcare insurance information regarding the child, most of which was and is protected by HIPAA. She reasonably expected that the information that she provided, as well as the details of medical treatment that it generated in the course of treatment, would be carefully protected.

169.   Plaintiff Dinkins is especially alarmed by the vagueness of her child's stolen medical information (PHI) and equally by the fact that the child's Social Security number was identified along with other personally identifying information as among the breached data on Singing River's computer system.

170.   Since the Data Breach and knowing that criminals have access to her child's personal information is concerning. Plaintiff Dinkins believes that she has to take extra measures to monitor the young teenaged child's credit as well as her own, since fraudulent activity in the child's name is more difficult to find and has a far longer impact. Having to do this every week not only wastes her time, which she could use for more productive activities. As a result of Singing River's negligence and at its direct recommendation (*see* Notice Letter), her time is wasted.

171.     The direct impacts of the Data Breach on her life have also caused (and continues to cause) Plaintiff Dinkins great stress and anxiety. As Singing River explains in its Notice Letter to her, she must "remain vigilant against incidents of identity theft and fraud by reviewing [her child's] account statements and monitoring [her child's] credit reports for suspicious activity and to detect errors over the next 12 to 24 months." *See* Collective Ex. A.

172.     Plaintiff Dinkins suffered actual injury from having her Private Information compromised as a result of the Data Breach including, but not limited to (a) damage to and diminution in the value of Private Information, a form of property that Defendant obtained from Plaintiff; (b) violation of privacy rights; and (c) present, imminent and impending injury arising from the increased risk of identity theft and fraud.

173.     As a result of the Data Breach, Plaintiff Dinkins' child's privacy has been damaged. The child is and will continue to be at increased risk of identity theft and fraud for a lifetime.

174.     Plaintiff Dinkins greatly values her child's privacy, and would not have provided the child's Private Information, undertaken the services and paid the amounts that she did if she had known that the Private Information would be maintained using inadequate data security systems.

175.     Plaintiff Dinkins sent Defendant notice, via certified mail and pursuant to the Mississippi Tort Claims Act, Miss. Code §§ 11-46-11, *et seq*., of Defendant's failure to "prevent [her child's] nonencrypted and nonredacted PII from unauthorized access and exfiltration, theft, or disclosure" and "implement and maintain reasonable security procedures and practices." Defendant has yet to cure such inadequacies and has until September 9, 2024 to do so.

## PLAINTIFFS' AND CLASS MEMBERS' INJURIES

176.    Given the sensitivity of the Private Information involved in this Data Breach, Plaintiffs and Class Members have all suffered damages and will face a substantial risk of additional injuries for the rest of their lives. Yet, to date, Defendant has merely offered to provide victims of the Data Breach with limited, abbreviated subscriptions to credit monitoring services. This does nothing to compensate Plaintiffs or Class Members for many of the injuries they have already suffered. Nor will it prevent additional harm from befalling Plaintiffs and Class Members as a result of the Data Breach. And at the conclusion of these limited subscriptions, victims will be required to pay for such services out of their own pocket.

177.    Defendant Singing River's offer of just one year of credit monitoring services through IDX is a tacit admission that its failure to protect their Private Information has caused Plaintiffs and Class great injuries. *See* Ex. A.

178.    Singing River's offer fails to provide any compensation for its unauthorized release and disclosure of Plaintiffs' and Class Members' Private Information, loss of privacy, out of pocket costs, and the time that Plaintiffs are required to spend attempting to mitigate their injuries.

179.    Furthermore, Defendant Singing River's credit monitoring offer and advice (*see* Ex. A) to Plaintiffs and Class Members squarely places the burden on Plaintiffs and Class Members, rather than on the Defendant, to investigate and protect themselves from Defendant's tortious acts resulting in the Data Breach. Defendant merely sent instructions to Plaintiffs and Class Members about actions they can affirmatively take to protect themselves.

180.    Plaintiffs and Class Members have been damaged by the compromise and exfiltration of their Private Information in the Data Breach, and by the severe disruption to their

lives as a direct and foreseeable consequence of this Data Breach. Their loss of privacy is not easily restored.

181.   Plaintiffs' and Class Members' Private Information was compromised and exfiltrated by cybercriminals as a direct and proximate result of the Data Breach.

182.   Plaintiffs and the Class were damaged in that their Private Information is now in the hands of cybercriminals, sold and potentially for sale for years into the future.

183.   As a direct and proximate result of Defendant's conduct, Plaintiffs and Class Members have been placed at an actual, imminent, and substantial risk of harm from fraud and identity theft. Likewise, they have already lost their privacy due to the Data Breach, which could have been prevented with adequate security.

184.   As a direct and proximate result of Defendant's conduct, Plaintiffs and Class Members have been forced to expend time dealing with the effects of the Data Breach.

185.   Plaintiffs and Class Members face a substantial and imminent risk of out-of-pocket fraud losses such as loans opened in their names, medical services billed in their names, tax return fraud, utility bills opened in their names, credit card fraud, and similar identity theft.

186.   Plaintiffs and Class Members have and may continue to incur out-of-pocket costs for protective measures such as changing telephone numbers, credit monitoring fees, credit report fees, credit freeze fees, and similar costs directly or indirectly related to the Data Breach.

187.   Plaintiffs and Class Members face substantial risk of being targeted for future phishing, data intrusion, and other illegal schemes based on their Private Information as potential fraudsters could use that information to more effectively target such schemes to Plaintiffs and Class Members.

188.     Plaintiffs and Class Members also suffered a loss of value of their Private Information when it was acquired by cyberthieves in the Data Breach. Numerous courts have recognized the propriety of loss of value damages in related cases.

189.     Plaintiffs and Class Members have spent and will continue to spend significant amounts of time monitoring their financial accounts and records for misuse.

190.     Plaintiffs and Class Members have suffered or will suffer actual injury as a direct result of the Data Breach. Many victims suffered ascertainable losses in the form of out-of-pocket expenses and the value of their time reasonably incurred to remedy or mitigate the effects of the Data Breach relating to:

     a.    Finding fraudulent charges;

     b.    Canceling and reissuing credit and debit cards;

     c.    Purchasing credit monitoring and identity theft prevention;

     d.    Monitoring their medical records for fraudulent charges and data;

     e.    Addressing their inability to withdraw funds linked to compromised accounts;

     f.    Taking trips to banks and waiting in line to obtain funds held in limited accounts;

     g.    Placing "freezes" and "alerts" with credit reporting agencies;

     h.    Spending time on the phone with or at a financial institution to dispute fraudulent charges;

     i.    Contacting financial institutions and closing or modifying financial accounts;

     j.    Resetting automatic billing and payment instructions from compromised credit and debit cards to new ones;

k.   Paying late fees and declined payment fees imposed as a result of failed automatic payments that were tied to compromised cards that had to be cancelled; and

l.   Closely reviewing and monitoring bank accounts and credit reports for unauthorized activity for years to come.

191.   Moreover, Plaintiffs and Class Members have an interest in ensuring that their Private Information, which is believed to remain in the possession of Defendant, is protected from further breaches by the implementation of security measures and safeguards, including but not limited to, making sure that the storage of data or documents containing personal and financial information as well as health information is not accessible online and that access to such data is password-protected.

192.   Further, as a result of Defendant's conduct, Plaintiffs and Class Members are forced to live with the anxiety that their Private Information—which contains the most intimate details about a person's life—may be disclosed to the entire world, thereby subjecting them to embarrassment and depriving them of any right to privacy whatsoever.

193.   Defendant's delay in identifying and reporting the Data Breach caused additional harm. In a data breach, time is of the essence to reduce the imminent misuse of PII and PHI. Early notification helps a victim of a Data Breach mitigate their injuries, and in the converse, delayed notification causes more harm and increases the risk of identity theft.  Here, Singing River knew of the breach *since August 2023* and did not notify the victims until five months later, in January 2024. Yet Singing River offered no explanation of purpose for the delay. This delay violates HIPAA and HHS notification requirements. This sort of delay increased and continues to increase the injuries to Plaintiffs and the Class.

## CLASS ACTION ALLEGATIONS

194.    Plaintiffs bring this action on behalf of themselves and on behalf of all other persons similarly situated.

195.    Plaintiffs propose the following Class definition, subject to amendment as appropriate:

> All persons whose Private Information Private Information was potentially accessible during the Data Breach and/or known to be compromised by the Data Breach discovered by Defendant Singing River in August 2023 and to whom it provided Notice about the Data Breach (the "Class").

196.    Excluded from the Class are Defendant's officers and directors, and any entity in which Defendant has a controlling interest; and the affiliates, legal representatives, attorneys, successors, heirs, and assigns of Defendant. Excluded also from the Class are members of the judiciary to whom this case is assigned, their families and members of their staff.

197.    Plaintiffs hereby reserve the right to amend or modify the class definitions with greater specificity or division after having had an opportunity to conduct discovery. The proposed Class meets the criteria for certification Fed. R. Civ. P. Rule 23.

198.    Numerosity, Fed. R. Civ. P. 23(a)(1): The Members of the Class are so numerous that joinder of all of them is impracticable. The number of Class Members affected is believed to be around **895,204**.

199.    Commonality: As required by Fed. R. Civ. P. 23(a)(2) and (b)(3), there are questions of law and fact common to the Class, which predominate over any questions affecting only individual Class Members. These common questions of law and fact include, without limitation:

> a.    Whether Defendant unlawfully used, maintained, lost, or disclosed Plaintiffs' and Class Members' Private Information;

b.    Whether Defendant failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information compromised in the Data Breach;

c.    Whether Defendant's data security systems prior to and during the Data Breach complied with applicable data security laws and regulations;

d.    Whether Defendant's data security systems prior to and during the Data Breach were consistent with industry standards;

e.    Whether Defendant owed a duty to Class Members to safeguard their Private Information;

f.    Whether Defendant breached its duty to Class Members to safeguard their Private Information;

g.    Whether computer hackers obtained Class Members' Private Information in the Data Breach;

h.    Whether Defendant knew or should have known that its data security systems and monitoring processes were deficient;

i.    Whether Plaintiffs and Class Members suffered legally cognizable damages as a result of Defendant's misconduct;

j.    Whether Defendant failed to provide notice of the Data Breach in a timely manner; and

k.    Whether Plaintiffs and Class Members are entitled to damages, civil penalties, punitive damages, and/or injunctive relief.

200.    Typicality, Fed. R. Civ. P. 23(a)(3): Plaintiffs' claims are typical of those of other Class Members because Plaintiffs' Private Information, like that of every other Class Member, was compromised in the Data Breach.

201.    Adequacy of Representation, Fed. R. Civ. P. 23(a)(4): Plaintiffs will fairly and adequately represent and protect the interests of the Members of the Class. Plaintiffs' Counsel is competent and experienced in litigating class actions, including data privacy litigation of this kind.

202.    Predominance: Defendant has engaged in a common course of conduct toward Plaintiffs and Class Members, in that all the Plaintiffs' and Class Members' data was stored on the same computer systems and unlawfully accessed in the same way. The common issues arising from Defendant's conduct affecting Class Members set out above predominate over any individualized issues. Adjudication of these common issues in a single action has important and desirable advantages of judicial economy.

203.    Superiority, Fed. R. Civ. P. 23(b)(3): A class action is superior to other available methods for the fair and efficient adjudication of the controversy. Class treatment of common questions of law and fact is superior to multiple individual actions or piecemeal litigation. Absent a class action, most Class Members would likely find that the cost of litigating their individual claims is prohibitively high and would therefore have no effective remedy. The prosecution of separate actions by individual Class Members would create a risk of inconsistent or varying adjudications with respect to individual Class Members, which would establish incompatible standards of conduct for Defendant. In contrast, the conduct of this action as a class action presents far fewer management difficulties, conserves judicial resources and the parties' resources, and protects the rights of each Class Member.

204.     Defendant has acted on grounds that apply generally to the Class as a whole, so that class certification, injunctive relief, and corresponding declaratory relief are appropriate on a class-wide basis.

205.     Likewise, particular issues are appropriate for certification under Rule 23(c)(4) because such claims present only particular, common issues, the resolution of which would advance the disposition of this matter and the parties' interests therein. Such particular issues include, but are not limited to:

a.      Whether Defendant failed to timely notify the public of the Data Breach;

b.      Whether Defendant owed a legal duty to Plaintiffs and the Class to exercise due care in collecting, storing, and safeguarding their Private Information;

c.      Whether Defendant's security measures to protect their data systems were reasonable in light of best practices recommended by data security experts;

d.      Whether Defendant's failure to institute adequate protective security measures amounted to negligence;

e.      Whether Defendant failed to take commercially reasonable steps to safeguard consumer Private Information;

f.      Whether adherence to FTC data security recommendations, and measures recommended by data security experts would have reasonably prevented the Data Breach; and

g.      Whether Defendant failed to abide by its responsibilities under HIPAA.

206.     Finally, all Members of the proposed Class are readily ascertainable. Defendant has access to Class Members' names and addresses affected by the Data Breach. Class Members have already been preliminarily identified and sent notice of the Data Breach by Defendant.

## CAUSES OF ACTION

### First Count
### Negligence
### (On Behalf of Plaintiffs and Class Members)

207.    Plaintiffs re-allege and incorporate the above allegations as if fully set forth herein.

208.    Defendant Singing River required Plaintiffs and Class Members to submit non-public personal information in order to obtain healthcare/medical services and/or employment.

209.    By collecting and storing this data in Singing River's computer property, and sharing it and using it for commercial gain, Defendant had a duty of care to use reasonable means to secure and safeguard their computer property—and Class Members' Private Information held within it—to prevent disclosure of the information, and to safeguard the information from theft. Defendant's duty included a responsibility to implement processes by which it could detect a breach of their security systems in a reasonably expeditious period of time and to give prompt notice to those affected in the case of a Data Breach.

210.    Defendant owed a duty of care to Plaintiffs and Class Members to provide data security consistent with industry standards and other requirements discussed herein, and to ensure that its systems and networks, and the personnel responsible for them, adequately protected the Private Information.

211.    Defendant's duty of care to use reasonable security measures arose as a result of the special relationship that existed between Defendant Singing River and its patients and employees, which is recognized by laws and regulations including but not limited to HIPAA, as well as common law. Defendant was in a position to ensure that its systems were sufficient to protect against the foreseeable risk of harm to Class Members from a Data Breach.

212.    Defendant's duty to use reasonable security measures under HIPAA required Defendant to "reasonably protect" confidential data from "any intentional or unintentional use or disclosure" and to "have in place appropriate administrative, technical, and physical safeguards to protect the privacy of protected health information." 45 C.F.R. § 164.530(c)(1). Some or all of the healthcare, medical, and/or medical information at issue in this case constitutes "protected health information" within the meaning of HIPAA.

213.    In addition, pursuant to HIPAA, Defendant had a duty to render the electronic PHI they maintained unusable, unreadable, or indecipherable to unauthorized individuals, as specified in the HIPAA Security Rule by "the use of an algorithmic process to transform data into a form in which there is a low probability of assigning meaning without use of a confidential process or key." *See* definition of encryption at 45 C.F.R. § 164.304.

214.    In addition, Defendant had a duty to employ reasonable security measures under Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45, which prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair practice of failing to use reasonable measures to protect confidential data.

215.    Defendant violated these statutes when it engaged in the actions and omissions alleged herein, and Plaintiffs' and Class Members' injuries were a direct and proximate result of Defendant's violations of these statutes. Plaintiff, therefore, is entitled to the evidentiary presumptions for negligence *per se*.

216.    Defendant's duty to use reasonable care in protecting confidential data arose not only as a result of the statutes and regulations described above, but also because Defendant is bound by industry standards to protect confidential Private Information.

217.   Defendant breached its duties, and thus were negligent, by failing to use reasonable measures to protect Class Members' Private Information. The specific negligent acts and omissions committed by Defendant include, but are not limited to, the following:

  a.   Failing to adopt, implement, and maintain adequate security measures to safeguard Class Members' Private Information;

  b.   Failing to adequately monitor the security of their networks and systems;

  c.   Failure to periodically ensure that their email system had plans in place to maintain reasonable data security safeguards;

  d.   Allowing unauthorized access to Class Members' Private Information;

  e.   Failing to detect in a timely manner that Class Members' Private Information had been compromised; and

  f.   Failing to timely notify Class Members about the Data Breach so that they could take appropriate steps to mitigate the potential for identity theft and other damages.

218.   It was foreseeable that Defendant's failure to use reasonable measures to protect Class Members' Private Information would result in injury to Class Members. Further, the breach of security was reasonably foreseeable given the known high frequency of cyberattacks and data breaches in the healthcare industry.

219.   It was therefore foreseeable that the failure to adequately safeguard Class Members' Private Information would result in one or more types of injuries to Class Members.

220.   Plaintiffs and Class Members are entitled to compensatory and consequential damages suffered as a result of the Data Breach.

221.     Defendant's negligent conduct is ongoing, in that it still holds the Private Information of Plaintiffs and Class Members in an unsafe and unsecure manner.

222.     Plaintiffs and Class Members are also entitled to injunctive relief requiring Defendant to (i) strengthen its data security systems and monitoring procedures; (ii) submit to future annual audits of those systems and monitoring procedures; and (iii) continue to provide adequate credit monitoring to all Class Members.

### Second Count
### Breach of Implied Contract
### (On Behalf of Plaintiffs and Class Members)

223.     Plaintiffs re-allege and incorporate the above allegations as if fully set forth herein.

224.     Plaintiffs and Class Members provided their Private Information to Defendant Singing River in exchange for Defendant's medical services, they entered into implied contracts with Defendant pursuant to which Defendant agreed to reasonably protect such information.

225.     Plaintiffs and Class Members were required to provide Defendant with their Private Information in order to receive medical care and treatment.

226.     When Plaintiffs and Class Members provided their Private Information to Defendant when seeking medical services, they entered into implied contracts in which Defendant agreed to comply with its statutory and common law duties to protect their Private Information and to timely notify them in the event of a Data Breach.

227.     Plaintiffs would not have provided their PII to Defendant had they known that Defendant would not safeguard their PII, as promised, or provide timely notice of the Data Breach.

228.     Based on Defendant's representations (including those in its Joint Notice of Privacy Practices, cited above), legal obligations, and acceptance of Plaintiffs' and the Class Members'

Private Information, Defendant had an implied duty to safeguard their Private Information through the use of reasonable industry standards.

229.  Defendant solicited, offered, and invited Class Members to provide their Private Information as part of Defendant's regular business practices. Plaintiffs and Class Members accepted Defendant's offers and provided their Private Information to Defendant.

230.  In entering into such implied contracts, Plaintiffs and Class Members reasonably believed and expected that Defendant's data security practices complied with relevant laws and regulations, including HIPAA, and were consistent with industry standards.

231.  Plaintiffs and Class Members paid money to Defendant for medical services and the ancillary costs associated with those services with the reasonable belief and expectation that Defendant would use part of its earnings to obtain adequate data security. Defendant failed to do so.

232.  Plaintiffs and Class Members would not have entrusted their Private Information to Defendant in the absence of the implied contract between them and Defendant to keep their information reasonably secure.

233.  Plaintiffs and Class Members would not have entrusted their Private Information to Defendant in the absence of its implied promise to monitor their computer systems and networks to ensure that it adopted reasonable data security measures to protect their highly sensitive PII and PHI.

234.  Plaintiffs and Class Members fully and adequately performed their obligations under the implied contracts with Defendant.

235.  Defendant breached its implied contracts with Class Members by failing to safeguard and protect their Private Information.

236.     As a direct and proximate result of Defendant's breach of the implied contracts, Class Members sustained damages as alleged herein, including the loss of the benefit of the bargain.

237.     Plaintiffs and Class Members are entitled to compensatory, consequential, and nominal damages suffered as a result of the Data Breach.

238.     Plaintiffs and Class Members are also entitled to injunctive relief requiring Defendant to, *e.g.*, (i) strengthen its data security systems and monitoring procedures; (ii) submit to future annual audits of those systems and monitoring procedures; (iii) encrypt PII and PHI that is especially sensitive, and (iv) immediately provide adequate long-term credit monitoring to Plaintiffs and all Class Members.

**Third Count**
**Breach of Fiduciary Duty**
**(On Behalf of Plaintiffs and Class Members)**

239.     Plaintiffs re-allege and incorporate the above allegations as if fully set forth herein.

240.     In light of the special relationship between Defendant Singing River and Plaintiffs and Class Members, whereby Defendant became guardian of Plaintiffs' and Class Members' Private Information, Defendant became a fiduciary by its undertaking and guardianship of the Private Information, to act primarily for Plaintiffs and Class Members, (1) for the safeguarding of Plaintiffs' and Class Members' Private Information; (2) to timely notify Plaintiffs and Class Members of a Data Breach and disclosure; and (3) to maintain complete and accurate records of what information (and where) Defendant did and does store.

241.     Defendant has a fiduciary duty to act for the benefit of Plaintiffs and Class Members upon matters within the scope of its relationship with its current and former patients and employees to keep secure their Private Information.

242.    Defendant breached its fiduciary duties to Plaintiffs and Class Members by failing to diligently discover, investigate, and give detailed notice of the Data Breach to Plaintiffs and the Class in a reasonable and practicable period of time.

243.    Defendant breached its fiduciary duties to Plaintiffs and Class Members by failing to encrypt and otherwise protect the integrity of the systems containing Plaintiffs' and Class Members' Private Information.

244.    Defendant breached its fiduciary duties owed to Plaintiffs and Class Members by failing to timely notify and/or warn Plaintiffs and Class Members of the Data Breach.

245.    Defendant breached its fiduciary duties to Plaintiffs and Class Members by otherwise failing to safeguard Plaintiffs' and Class Members' Private Information.

246.    The fiduciary duty is explicated under the procedures set forth in the Health Insurance Portability and Accountability Act Privacy Rule, including, without limitation the procedures and definitions of 45 C.F.R. § 160.103 and 45 C.F.R. § 164.530, which required Defendant to apply appropriate administrative, technical, and physical safeguards to protect the privacy of patient information and to secure the health care information it maintains and to keep it free from disclosure.

247.    Defendant breached its fiduciary duty to Plaintiffs and Class Members by failing to implement sufficient safeguards and by disclosing Plaintiffs' and other Class Members' Private Information to unauthorized third parties.

248.    As a direct result of Defendant's breach of its fiduciary duty and the disclosure of Plaintiffs' and Class Members' Private Information, Plaintiffs and the Class have suffered damages, including, without limitation, loss of the benefit of the bargain, exposure to heightened

future risk of identity theft, loss of privacy, confidentiality, embarrassment, emotional distress, and humiliation.

249.   As a direct and proximate result of Defendant's breaches of its fiduciary duties, Plaintiffs and Class Members have suffered and will suffer injury, including but not limited to: (i) actual identity theft; (ii) the compromise, publication, and/or theft of their Private Information; (iii) out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft and/or unauthorized use of their Private Information; (iv) lost opportunity costs associated with effort expended and the loss of productivity addressing and attempting to mitigate the actual and future consequences of the Data Breach, including but not limited to efforts spent researching how to prevent, detect, contest, and recover from identity theft; (v) the continued risk to their Private Information, which remains in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the Private Information in their continued possession; (vi) future costs in terms of time, effort, and money that will be expended as result of the Data Breach for the remainder of the lives of Plaintiffs and Class Members; and (vii) the diminished value of Defendant's services they received.

250.   As a direct and proximate result of Defendant's breach of its fiduciary duties, Plaintiffs and Class Members have suffered and will continue to suffer other forms of injury and/or harm, and other economic and non-economic losses. At the very least, Plaintiffs and the Class are entitled to nominal damages.

**Fourth Count**
**Invasion of Privacy**
**(On Behalf of Plaintiffs and Class Members)**

251.    Plaintiffs re-allege and incorporate the above allegations as if fully set forth herein. Plaintiffs bring this claim individually and on behalf of all Class Members.

252.    Plaintiffs and Class Members had a legitimate expectation of privacy regarding their highly sensitive and confidential Private Information and were accordingly entitled to the protection of this information against disclosure to unauthorized third parties.

253.    Defendant owed a duty to its current and former patients, including Plaintiffs and the Class, to keep this information confidential.

254.    The unauthorized acquisition (i.e., theft) by a third party of Plaintiffs' and Class Members' Private Information is highly offensive to a reasonable person.

255.    The intrusion was into a place or thing which was private and entitled to be private. Plaintiffs and the Class disclosed their sensitive and confidential information to Defendant, but did so privately, with the intention that their information would be kept confidential and protected from unauthorized disclosure. Plaintiffs and the Class were reasonable in their belief that such information would be kept private and would not be disclosed without their authorization.

256.    The Data Breach constitutes an intentional interference with Plaintiff' and the Class's interest in solitude or seclusion, either as to their person or as to their private affairs or concerns, of a kind that would be highly offensive to a reasonable person.

257.    Defendant acted with a knowing state of mind when it permitted the Data Breach because it knew its information security practices were inadequate.

258.    Defendant acted with a knowing state of mind when it failed to notify Plaintiffs and the Class in a timely fashion about the Data Breach, thereby materially impairing their mitigation efforts.

259.    Acting with knowledge, Defendant had notice and knew that its inadequate cybersecurity practices would cause injury to Plaintiffs and the Class.

260.    As a proximate result of Defendant's acts and omissions, the private and sensitive Private Information of Plaintiffs and the Class were stolen by a third party and is now available for disclosure and redisclosure without authorization, causing Plaintiffs and the Class to suffer damages (as detailed *supra*).

261.    Unless and until enjoined and restrained by order of this Court, Defendant's wrongful conduct will continue to cause great and irreparable injury to Plaintiffs and the Class since their Private Information is still maintained by Defendant with its inadequate cybersecurity system and policies.

262.    Plaintiffs and the Class have no adequate remedy at law for the injuries relating to Defendant's continued possession of their sensitive and confidential records. A judgment for monetary damages will not end Defendant's inability to safeguard the Private Information of Plaintiffs and the Class.

263.    In addition to injunctive relief, Plaintiffs and Class Members also seek compensatory damages for Defendant's invasion of privacy, which includes the value of the privacy interest invaded by Defendant, the costs of future monitoring of their credit history for identity theft and fraud for the rest of their lives, plus prejudgment interest and costs.

**Fifth Count**
**Unjust Enrichment**
**(On Behalf of Plaintiffs and Class Members)**

264.    Plaintiffs re-allege and incorporate the above allegations as if fully set forth herein. Plaintiffs bring this claim individually and on behalf of all Class Members. This count is plead in the alternative to the breach of implied contract count above.

265.    Upon information and belief, Defendant funds its data security measures entirely from its general revenue, including payments made by or on behalf of Plaintiffs and the Class Members.

266.    As such, a portion of the payments made by or on behalf of Plaintiffs and the Class Members is to be used to provide a reasonable level of data security, and the amount of the portion of each payment made that is allocated to data security is known to Defendant.

267.    Plaintiffs and Class Members conferred a monetary benefit on Defendant. Specifically, they purchased goods and services from Defendant and/or its agents and in so doing provided Defendant with their Private Information. In exchange, Plaintiffs and Class Members should have received from Defendant the goods and services that were the subject of the transaction and have their Private Information protected with adequate data security.

268.    Defendant knew that Plaintiffs and Class Members conferred a benefit which Defendant accepted. Defendant profited from these transactions and used the Private Information of Plaintiffs and Class Members for business purposes.

269.    In particular, Defendant enriched itself by saving the costs it reasonably should have expended on data security measures to secure Plaintiffs' and Class Members' Personal Information.  Instead of providing a reasonable level of security that would have prevented the hacking incident, Defendant instead calculated to increase its own profits at the expense of

Plaintiffs and Class Members by utilizing cheaper, ineffective security measures. Plaintiffs and Class Members, on the other hand, suffered as a direct and proximate result of Defendant's decision to prioritize its own profits over the requisite security.

270.    Under the principles of equity and good conscience, Defendant should not be permitted to retain the money belonging to Plaintiffs and Class Members, because Defendant failed to implement appropriate data management and security measures that are mandated by industry standards.

271.    Defendant failed to secure Plaintiff' and Class Members' Private Information and, therefore, did not provide full compensation for the benefit Plaintiffs and Class Members provided.

272.    Defendant acquired the Private Information through inequitable means in that it failed to disclose the inadequate security practices previously alleged.

273.    If Plaintiffs and Class Members knew that Defendant had not reasonably secured their Private Information, they would not have agreed to provide their Private Information to Defendant.

274.    Plaintiffs and Class Members have no adequate remedy at law.

275.    As a direct and proximate result of Defendant's conduct, Plaintiffs and Class Members have suffered and will suffer injury, including but not limited to: (a) actual identity theft; (b) the loss of the opportunity of how their Private Information is used; (c) the compromise, publication, and/or theft of their Private Information; (d) out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft, and/or unauthorized use of their Private Information; (e) lost opportunity costs associated with efforts expended and the loss of productivity addressing and attempting to mitigate the actual and future consequences of the Data Breach, including but not limited to efforts spent researching how to prevent, detect, contest, and recover

from identity theft; (f) the continued risk to their Private Information, which remains in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect Private Information in their continued possession; and (g) future costs in terms of time, effort, and money that will be expended to prevent, detect, contest, and repair the impact of the Private Information compromised as a result of the Data Breach for the remainder of the lives of Plaintiffs and Class Members.

276.    As a direct and proximate result of Defendant's conduct, Plaintiffs and Class Members have suffered and will continue to suffer other forms of injury and/or harm.

277.    Defendant should be compelled to disgorge into a common fund or constructive trust, for the benefit of Plaintiffs and Class Members, proceeds that they unjustly received from them. In the alternative, Defendant should be compelled to refund the amounts that Plaintiffs and Class Members overpaid for Defendant's services.

## Sixth Count
### Declaratory Judgment
### (On Behalf of Plaintiffs and Class Members)

278.    Plaintiffs re-allege and incorporate the above allegations as if fully set forth herein.

279.    Under the Declaratory Judgment Act, 28 U.S.C. §§ 2201, *et seq*., this Court is authorized to enter a judgment declaring the rights and legal relations of the parties and grant further necessary relief. Furthermore, the Court has broad authority to restrain acts, such as here, that are tortious and violate the terms of the federal and state statutes described in this Complaint.

280.    An actual controversy has arisen in the wake of the Defendant's Data Breach regarding its present and prospective common law and other duties to reasonably safeguard its customers' Personal Information and whether Defendant is currently maintaining data security

measures adequate to protect Plaintiffs and Class Members from further data breaches that compromise their Private Information.

281.   Plaintiffs allege that Defendant's data security measures remain inadequate. Plaintiffs will continue to suffer injury because of the compromise of their Private Information and remain at imminent risk that further compromises of their Private Information will occur in the future.

282.   Pursuant to its authority under the Declaratory Judgment Act, this Court should enter a judgment declaring, among other things, the following:

      a.   Defendant continues to owe a legal duty to secure patients' Private Information and to timely notify patients of a data breach under the common law, HIPAA, Section 5 of the FTC Act, and various states' statutes; and

      b.   Defendant continues to breach this legal duty by failing to employ reasonable measures to secure patients' Private Information.

283.   The Court also should issue corresponding prospective injunctive relief requiring Defendant to employ adequate security protocols consistent with law and industry standards to protect patients' Private Information.

284.   If an injunction is not issued, Plaintiffs and Class Members will suffer irreparable injury, and lack an adequate legal remedy, in the event of another data breach at Defendant. The risk of another such breach is real, immediate, and substantial. If another breach at Defendant occurs, Plaintiffs and Class Members will not have an adequate remedy at law because many of the resulting injuries are not readily quantified, and they will be forced to bring multiple lawsuits to rectify the same conduct.

285.     The hardship to Plaintiffs and Class Members if an injunction does not issue exceeds the hardship to Defendant if an injunction is issued. Among other things, if another massive data breach occurs at Defendant, Plaintiffs and Class Members will likely be subjected to fraud, identify theft, and other harms described herein. On the other hand, the cost to Defendant of complying with an injunction by employing reasonable prospective data security measures is relatively minimal, and Defendant has pre-existing legal obligations to employ such measures.

286.     Issuance of the requested injunction will not do a disservice to the public interest. To the contrary, such an injunction would benefit the public by preventing another data breach at Defendant, thus eliminating the additional injuries that would result to Plaintiffs and the millions of individuals whose Private Information would be further compromised.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray for judgment as follows:

   a)     For an Order certifying this action as a class action and appointing Plaintiffs and their counsel to represent the Class;

   b)     For equitable relief enjoining Defendant from engaging in the wrongful conduct complained of herein pertaining to the misuse and/or disclosure of Plaintiffs' and Class Members' Private Information, and from refusing to issue prompt, complete and accurate disclosures to Plaintiffs and Class Members;

   c)     For equitable relief compelling Defendant to utilize appropriate methods and policies with respect to consumer data collection, storage, and safety, and to disclose with specificity the type of Private Information compromised during the Data Breach;

d)  For equitable relief requiring restitution and disgorgement of the revenues wrongfully retained as a result of Defendant's wrongful conduct;

e)  Ordering Defendant to pay for not less than ten years of credit monitoring services for Plaintiffs and the Class;

f)  For an award of actual damages, compensatory damages, statutory damages, and statutory penalties, in an amount to be determined, as allowable by law;

g)  For an award of attorneys' fees and costs, and any other expense, including expert witness fees;

h)  Pre- and post-judgment interest on any amounts awarded; and

i)  Such other and further relief as this court may deem just and proper.

## <u>JURY TRIAL DEMANDED</u>

Plaintiffs demand a trial by jury on all claims so triable.

Dated: August 9, 2024                    Respectfully submitted,

**MASON LLP**

*/s/ Lisa A. White*
Lisa A. White (*admitted pro hac vice*)
Gary E. Mason (*admitted pro hac vice*)
Danielle L. Perry (*admitted pro hac vice*)
5335 Wisconsin Avenue, NW, Suite 640
Washington, DC 20015
Tel: (202) 429-2290
Email: gmason@masonllp.com
Email: dperry@masonllp.com
Email: lwhite@masonllp.com

*/s/ Erik S. Heninger*
Erik S. Heninger (100951)
**HENINGER GARRISON & DAVIS, LLC**
2224 1st Avenue North
Birmingham, AL 35203
Tel: (205)326-3336

Facsimile: (205)326-3332
Email: erik@hgdlawfirm.com

Jeff Ostrow (*admitted pro hac vice* in consolidated case)
**KOPELOWITZ OSTROW P.A.**
One West Las Olas Blvd., Suite 500
Fort Lauderdale, Florida 33301
Tel: (954) 332-4200
Email: ostrow@kolawyers.com

*Attorneys for Plaintiffs and Proposed Class*

### CERTIFICATE OF SERVICE

I, the undersigned, do hereby certify that I have on this date filed the above **Consolidated Amended Complaint** using the Court's CM/ECF system which will send notification of same to all counsel of record.

This the 9th day of August 2024.

*/s/ Lisa A. White*
Lisa A. White (*admitted pro hac vice*)